## W.M.A. TRANSIT COMPANY *v.* PARK LAWN LOUNGE, INC., ETC.

[No. 141, September Term, 1965.]

*Decided February 10, 1966.*

The cause was argued before HAMMOND, MARBURY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

*Arthur A. Anderson, Jr.,* for appellant.

No brief and no appearance for appellee.

HAMMOND, J., delivered the opinion of the Court.

The course this case has taken has required the appellant to raise much ado about very little. Suit was filed below by W. M. A. Transit Company (WMA) to recover from Park Lawn Lounge, Inc. (Park Lawn), doing business as Dairy Land Park Lounge, Inc. (Dairy Land) the agreed price for charter buses hired to bring lady bingo players from Washington and way points to the Park Lawn at Jessup in Anne Arundel County, in order to benefit the Women's Auxiliary of the North Arundel Hospital Association.

It appears from the record that John Roberts, Jr., is president of Dairy Land and that George O. Gillis is its manager, and that Gillis is vice-president of Park Lawn, the capital stock of which is in the name of Mrs. Roberts. It was stipulated that the traders and liquor licenses for the premises known as Dairy Land were applied for by, and issued to, "Park Lawn Lounge, Inc., trading as Dairy Land Park Lounge," that Gillis was at times here pertinent "an officer and/or an authorized agent of Park Lawn * * *," and that Park Lawn leases the premises known as Dairy Land from John F. Roberts, Jr. and Mary E. Roberts, his wife. Gillis' testimony was that he was manager of Dairy Land and vice-president of Park Lawn and that he needed no special specific authorization to bind these entities.

It appears also that Roberts had been kind and generous to the Women's Auxiliary in its efforts to raise money for the Hospital. He had turned over a hall at Dairy Land to the Auxiliary every Thursday night for bingo, he bought the bingo equipment, he had on occasion supplied spaghetti dinners for the ladies, and had told Gillis to arrange to have handbills and posters printed advertising the Thursday night bingo games and to arrange for the hire of certain buses that were to bring the bingo patrons to Dairy Land, including those of the appellant.

WMA buses ran to Dairy Land from Washington on the tenth, seventeenth, twenty-fourth and thirty-first of January, 1963, and the total of the charges for their hire was four hundred sixty-four dollars. Park Lawn refused to pay the bill rendered in this amount (apparently from Mr. Roberts' remarks from the stand for what he considered to be failure of consideration in that the Transit Company "* * * sent empty buses over for the Ladies' Auxiliary with not one passenger on them") and WMA sued Park Lawn; its formal defense was that Gillis had hired the buses on behalf of the Women's Auxiliary and not on behalf of Park Lawn and that only the Auxiliary was liable for the bill.

Judge Duckett at the conclusion of the testimony said: "Mr. Roberts has been so kind to this North Anne Arundel Hospital, I think I'll have to make the W. M. & A. contribute some-

thing to it, too, so I'm going to split the claim and give judgment in favor of the plaintiff for one-half of the claim, two hundred and thirty-two dollars." When counsel for the bus company pointed out that this vicarious judicial charitable contribution was improper because "these people either owe W. M. A. four hundred and sixty-four dollars or they don't owe them a nickel," Judge Duckett accepted the second of the alternatives and announced "verdict for the defendant," without disclosing any basis for his decision.

We think the testimony compels a finding that Park Lawn, doing business as Dairy Land, ordered the buses intending to pay for them, that WMA understood this and accepted the order on the credit of Dairy Land alone, and that Park Lawn is therefore liable for the agreed cost of their hire. It is undisputed that Gillis called the bus company's office and that in response, its general passenger agent, Chew, went to Dairy Land and talked to Gillis on December 31, 1962. Chew said flatly that Gillis identified himself as manager of Dairy Land in his office on the premises of Dairy Land, that Gillis was told the cost of the buses and then requested WMA "* * * to operate two routes from Washington, D. C., to start on January 10, 1963," and told Chew to send the bills to Dairy Land. "No mention was made of any other organization [than Dairy Land]." Chew said the first time he had heard of the Women's Auxiliary in connection with the matter was when some months after the bus company's bill was rendered to Park Lawn he received a call from a Mrs. Ellison (who was then president of the Auxiliary), asking if something could be taken off the bill because the buses had been used for the benefit of the Auxiliary. Although Gillis testified that he was acting "* * * as the intermediary for the Hospital Committee," when asked if he had revealed to Mr. Chew that he was acting for the Hospital Association he said: "* * * vaguely, I don't remember * * * the exact words. * * * I don't know whether I discussed it point blank with Mr. Chew or not."

Both Mrs. Ellison, the president of the Auxiliary when the buses ran, and Mrs. Waters who was president when the buses were ordered, testified that their organization did not authorize Gillis to act for them or pledge their credit, and had no knowl-

edge that he had ever done so. The only buses the Auxiliary had paid for were those of the B. and A. Bus Company which the Auxiliary ladies had themselves ordered. Mrs. Ellison testified that she first became aware of the WMA bill in February of 1963 when "Mr. Roberts * * * the owner of Dairy Land" showed it to her and asked her to call Chew and see if he would take something off the bill. Chew told her "* * * he couldn't take anything off the bill," and then, she said, "I told Mr. Roberts and Mr. Roberts said he would take care of it [the bill]." Mr. Roberts never indicated to her that "* * * this was an obligation of the Women's Auxiliary.

Mr. Roberts did not deny Mrs. Ellison's testimony that he had said he would take care of the bill.

The trial court's judgment must be set aside as clearly erroneous on the evidence. Md. Rule 886.

> *Judgment reversed, with costs, and judgment entered for the appellant against the appellee as of February 8, 1965, in the amount of four hundred sixty-four dollars.*